NEW YORK STATE EDUCATION DEPARTMENT
UNIVERSITY OF THE STATE OF NEW YORK
-------------------------------------------------------------------------X

In the Matter of the Disciplinary Proceeding between

**NEW YORK CITY DEPARTMENT OF EDUCATION,**            **SED FILE # 28,937**
                                                    Complainant

                 -and-            **OPINION**
                                                    **AND AWARD**

**ANNA DENICOLO,**
                                        Respondent

Pursuant to Education Law Section 3020-a

-------------------------------------------------------------------------X

**Before LISA BROGAN, ESQ., Hearing Officer**

**APPEARANCES:**

      **For the Complainant:**
      **CHARITY GUERRA, ESQ., ACTING GENERAL COUNSEL/CHIEF DEPUTY**
      **COUNSEL TO THE CHANCELLOR, by MEAGAN GORDON, ESQ.**

      **For the Respondent:**
      **RICHARD E. CASAGRANDE, GENERAL COUNSEL, NYSUT**
          **by CHRIS CALLAGY, ESQ.**

Pursuant to the provisions of New York State Education Law §3020-a, the undersigned was appointed to hear and decide whether there is just cause for the proposed disciplinary action against the Respondent, Anna Denicolo. A pre-hearing conference was held on March 30, 2016. Hearings were conducted at the offices of the New York City Department of Education (the "Department") at 100 Gold Street in New York City on April 12, 18, 20 and 21, 2016. The record was closed upon receipt of the final transcript.

Both parties were represented by counsel in this proceeding and had a full and fair opportunity to adduce evidence, cross-examine witnesses and to make argument in support of their respective positions. The evidence adduced, the legal authorities cited and all the positions

1

and arguments set forth by the parties have been fully considered in the preparation and issuance

of this Opinion and Award, whether or not specifically mentioned herein.

## THE CHARGES AND SPECIFICATIONS

The Respondent has been charged as follows:

## SPECIFICATIONS

**ANNA DENICOLO** (hereinafter referred to as "Respondent"), is a tenured teacher under File # 0655074 formerly assigned to P. S. 195 within District 12 in Bronx, NY. During the 2015-2016 school year, Respondent engaged in neglect of duty, misconduct, verbal abuse, insubordination, harassment and conduct unbecoming her position as follows:

## In Particular

**SPECIFICATION 1:** On or about September 30, 2015, Respondent failed to follow school protocol, in that Respondent:
   A. Failed to take Student A[1] into her classroom when said student was crying.
   B. Stated to Student A's family member who was dropping Student A off at school, words to the effect of: don't have time to deal with her.
   C. Failed to call the main office and/or ask for assistance from the administration regarding Student A crying.
   D. Sent Student A to a school aide who is not the appropriate person to be contacted when a student is crying and/or in crisis.

**SPECIFICATION 2:** On or about and between September 1, 2015 and December 14, 2015, Respondent called Student A's parent repeatedly in the evening, after being asked by parent to refrain from calling the home.

**SPECIFICATION 3:** On or about and between September 1, 2015 and December 14, 2015, Respondent stated to Student A's mother, while in the presence of Student A and/or student(s) and/or parent(s), words to the effect of: Your daughter has mental problems.

**SPECIFICATION 4:** On or about and between September 1, 2015 and December 14, 2015, Respondent stated to Student A's mother words to the effect of:
   A. Your daughter is a liar.
   B. Your daughter lied and you backed her up.
   C. I am pretty upset. I want to know what you said to back your daughter up. I want to know what you said to the office.
   D. We are not done.
   E. I am not done with you.
   F. Can you meet with me? The school is failing your daughter. They do not have your best interest at heart and they are f---ing your daughter up.

---

[1] Student A was identified at trial, and is referred to hereinafter as C.S.

**SPECIFICATION 5:** [withdrawn]

**SPECIFICATION 6:** On or about and between September 1, 2015 and December 14, 2015, Respondent:
  A. Stated to her classroom of students that Student A was sick when she was not in fact sick, thereby violating Student A's right to privacy and/or confidentiality.
  B. Used classroom time to have students make get well letters, which was not part of the school curriculum and/or which violated Student A's privacy.
  C. Sent said get well letters to Student A's home.
  D. Caused Student A and/or the parents of Student A to become confused and/or upset after receiving said get well cards.
  E. Sent an application for home school instruction with the heading "as per the administration" to Student A's home without approval of the principal or any other administrator of the school.

### The Foregoing Constitutes:

- Just cause for disciplinary action pursuant to Section 3020-a of the Education Law;
- Substantial cause rendering the Respondent unfit to perform her obligations properly to the service;
- Conduct unbecoming the Respondent's position, or conduct prejudicial to the good order, efficiency or discipline of the service;
- A violation of the by-laws, rules and regulations of the Chancellor, Department, School or District;
- Misconduct;
- Insubordination;
- Neglect of duty;
- Harassment;
- Verbal abuse;
- Just cause for termination.[2]

### FACTS

Respondent is a tenured teacher who has been employed by the Department for twenty-six years. She holds Masters degrees in both education and school building leadership, along with credits and recommendations for school building leader, although she has never worked as an administrator. She is licensed to teach grades pre-K through six. Respondent taught at P.S.

---

[2] Department Exhibit 1. Department exhibits are referred to hereinafter as D1, D2, etc., and Respondent's exhibits as R1, R2, etc.

195 in the Bronx for the last five years, during which time she was directly supervised by Assistant Principal Fernandez, and beginning in the 2015-16 school year, worked under Principal Unal Karakas, who was new to the school that year. In 2015-16 Respondent was assigned to teach first grade, and it is her interactions with one student in that class, C.S., as well as her family members, that form the basis of these charges. The record contains reference to a lawsuit initiated by Respondent involving the school relating to matters which arose prior to 2015-16 and prior to Principal Karakas' tenure. The details of that lawsuit are not a matter of record in this case.

On the first day of school in September 2015, Respondent met C.S. and her mother, Austrolyn Owens-Dingle, when Ms. Owens-Dingle came to drop C.S. off for the day. From the start, there was an issue in getting C.S. into the classroom, as she suffered from severe separation anxiety and was loathe to leave her mother and enter the classroom. Although C.S. had been in school before, her mother had always accompanied and stayed with her, so this was her first experience being left on her own in school, and it was very challenging for her. The record is murky as to how often, if ever, she was actually able to enter the class and remain, but it is clear that on most if not all days, the child would cry and be unwilling to separate from her mother and stay in the classroom on her own. A protocol developed where Respondent would call for assistance from Ms. Graham, the social worker, or if she was unavailable, Dean Slattery. For the approximately five weeks that C.S. was at P.S. 195, it appears that she spent the majority of her days with one of these individuals, and not in Respondent's classroom. Although a consensus seems to have developed that Respondent's classroom was not the right setting for her, the school was clearly challenged in finding an appropriate alternative.

Within the first few days of school, Respondent had occasion to speak with Ms. Owens-Dingle at dismissal time. There is a dispute about what was actually said and whether there were

4

other people around at the time, but all agree that the words which passed between them concerned C.S.'s difficulties, and a further meeting was arranged for them to discuss the child's needs. That meeting took place between Respondent and Ms. Owens-Dingle on September 17, and the two discussed C.S.'s anxiety issues and her mother's desire to have her evaluated. Respondent indicated an ability and desire to help in that regard, and Owens-Dingle was appreciative. On or about September 25, Owens-Dingle brought certain documents to Respondent which would be needed in order to evaluate C.S. and Respondent said she would forward them on to the appropriate people. Respondent did so on September 27, and again on October 15, but for reasons which are not established on this record, misinformation was conveyed to Owens-Dingle indicating that Respondent had not forwarded the documents. Owens-Dingle identified Graham as the one who told her this, but it is not clear when this occurred, or if she was subsequently told that Respondent had actually done so.

In the meantime, on September 30, in an effort to find another way to get C.S. into her classroom, she was accompanied to school by her adult sister, Althea Anderson, instead of her mother. C.S. was crying and would not enter the classroom, and Respondent was unsuccessful in her efforts to reach Graham. Anderson did not appear at trial, but Owens-Dingle testified that she received a call from her from outside the classroom, during which she was told by Anderson that Respondent refused to take C.S. into the classroom, said she didn't have time for her, and had her take C.S. down the hall to a school aide to handle the matter. According to Owens-Dingle, Anderson was upset by what was going on, a sentiment Anderson repeated when she and her mother attended a meeting with Assistant Principal Desiree LaFontaine to complain about the incident, and about which LaFontaine testified at trial. LaFontaine said that Anderson had written down what had happened, but that document left LaFontaine's office with Anderson, and it is not part of this record. A subsequent meeting took place between Ms. Owens-Dingle and

5

Principal Karakas at which she repeated Anderson's account of what had occurred, but Anderson was not present at that meeting.

On October 5, 2015 Karakas convened a meeting with Respondent to discuss what had occurred on September 30, and wrote a letter to Respondent memorializing that meeting (D7). The letter states, and Respondent's testimony confirms, that Respondent did try to call Ms. Graham and, when she could not reach her, sent her to the school aide who was asked to try to reach Ms. Graham herself. Respondent also acknowledged that she had not tried to call the main office. Respondent denied saying she did not have time for C.S. At trial, Karakas explained that Respondent's actions were in violation of the de-escalation protocols in place at the school, which included calling the main office for help if needed. He described those protocols as set forth in Chancellor's Regulation A-411 (D11) and the school's Staff Handbook (D4), and identified professional development on the topic which had taken place on September 21, 2015 (D6). He concluded that Respondent had neglected her professional duties by not taking C.S. into the room and sending her to a school aide.

On or about October 7[3], C.S. was moved to another classroom in an effort to find a better setting for her. At lunchtime, Respondent saw C.S. and Owens-Dingle in the hallway. There is a sharp dispute about what transpired between the two in the hallway. According to Owens-Dingle, Respondent tapped her on the shoulder, called her daughter (Anderson) a liar, asked why she was backing up her daughter's lies, and wanted to know what she told administration. When Slattery appeared, again according to Owens-Dingle, Respondent retreated with the words "We're not done here." Respondent denies all of this, insisting that all she did was ask about

---

[3] The timeline, as best it can be discerned from this record, shows C.S. coming to Respondent's room on October 6, Respondent being told on that day that she was being removed from her class, and then returning on October 8 for what turned out to be the last time. As the incident in the hallway occurred while she was in the other class, I have determined that this occurred on October 7.

how C.S. was doing, because she saw her in tears in the hallway. She did acknowledge, however, mentioning to Owens-Dingle that she had been "written up" by the administration.

There was a brief effort to return C.S. to Respondent's classroom because the class she had been moved into was not the correct fit for her either, but on October 8 she was once again unwilling to enter Respondent's classroom, and thereafter Owens-Dingle removed C.S. from the school altogether. Although the timeline is not clear on the record, it was sometime after the incident in the hallway, and during this same time frame, that Owens-Dingle began receiving phone calls from Respondent at home. Again, there is a serious dispute about the number of and nature of these calls. At trial, Owens-Dingle said that she removed C.S. from the school primarily because of she feared Respondent's behavior based on their interactions, although she also offered that there was plenty of blame to go around, in her view, for the lack of attention to C.S.'s needs, including getting her evaluated and placed in the proper setting. Almost three weeks later, Owens-Dingle received a FedEx package from Respondent containing 27 get well cards from the other students in Respondent's class. According to Respondent, the students had been asking about C.S. and she told them she hadn't been feeling well and suggested that they send her get well cards. In the package, she included a home schooling application. Owens-Dingle said she and her daughter were confused and upset by the package and its contents, since C.S. was not sick, and barely knew the students in the class. The combination of the phone calls and the get well cards led Owens-Dingle and her husband to meet again with Karakas on October 30, 2015, complaining that they were being harassed by Respondent. Karakas called the matter into SCI, and it was referred back to the school for a school-based investigation which was conducted by AP LaFontaine.

7

Karakas convened a meeting with Respondent on December 10, 2015 to give her an opportunity to review student statements[4] and respond to the allegations. The meeting had to be rescheduled over a dispute regarding whether Respondent had a right to copies of those statements, as opposed to the opportunity to review them and transcribe her own notes (D9). The rescheduled meeting took place on December 14, 2015. On January 6, 2016 Karakas issued a letter memorializing that meeting (D10), in which he set forth the allegations regarding the incident in the hallway, phone calls and get well letters. In addition, Respondent was advised of Ms. Owens-Dingle's complaint that Respondent had made inappropriate comments about her daughter in the presence of others, a reference to their earliest conversation during the first week of school. Karakas also made mention of Owens-Dingle's belief that Respondent had failed to forward documents to the school-based support team ("SBST").[5] The letter states that Respondent chose not to respond to the allegations at the meeting, but rather, opted to submit a written rebuttal, which she did on December 21, 2015 (D2C). The defenses raised in that letter were addressed in Karakas' letter, and will be discussed at greater length below. Karakas concluded that Respondent had acted unprofessionally in calling the parent at home late in the evening and continued to do so after the parent specifically asked that she stop calling; that she made a comment about C.S. having "mental issues" in front of C.S., other students and parents, which he concluded constituted verbal abuse; that she was inappropriate, confrontational and unprofessional in her interactions with Owens-Dingle in the hallway; and that having students write get well cards violated C.S.'s right to privacy and confidentiality regarding a potential health condition, as well as confusing and upsetting her because she was not, in fact, sick.

---

[4] Although referred to as "student statements," these are actually LaFontaine's transcribed notes of her interviews with these students, who were first graders whose average age was six years old.

[5] I note that by this time Respondent had long since become aware that Graham either did not receive or was not admitting that she had received the first transmission of the documents, and they had been sent a second time. The second transmission took place on October 15.

The undersigned was not presented with any evidence of prior discipline. There is, however, evidence that Respondent had previously, in connection with another parent complaint, been placed on notice that she was not to interfere with student evaluations for special services, and to be respectful in her interactions with parents. Specifically, Karakas stated that she had been advised

> [t]hat she is to speak to parents professionally, that she is not to make judgments about referrals without contacting the SBST team and letting them handle referrals, that she is to evaluate children academically, behaviorally, but that she is not the person to make determinations for special education, and again just professionalism with how she speaks to parents.

(T. 262).

The Department preferred charges against Respondent on or about March 10, 2015, and this hearing ensued.

## POSITIONS OF THE PARTIES

### CONTENTIONS OF THE DEPARTMENT

The Department asserts that it has proven, by a preponderance of the evidence, that Respondent engaged in each and every act charged in the Specifications.[6] It insists that Respondent's blanket denials about all of these matters are not credible. It finds that Ms. Owens-Dingle was, by contrast, a thoroughly credible witness with no reason to lie, and posits that if she had been lying, she would have gone much further in order to harm Respondent.

The Department answers Respondent's contention that this whole case stems from Ms. Owens-Dingle's mistaken belief that Respondent had failed to deliver the documents in question, pointing out that Ms. Owens-Dingle herself repeatedly stated in her testimony that the main issue

---

[6] The parties' additional contentions regarding the specific conduct charged are found in the Discussion section below.

for her was Respondent's behavior in the classroom on September 30, and further asserts that none of Ms. Owens-Dingle's other issues regarding Respondent's alleged treatment and harassment of her would somehow disappear if she had known that the documents were, in fact, forwarded on. Regarding September 30, the Department urges me to give credit to the hearsay testimony of Ms. Owens-Dingle regarding her daughter Althea Anderson's experience with Respondent on that day, invoking both the present sense impression and excited utterance exceptions to the hearsay rule to assert that the testimony is reliable.

The Department contends that Respondent is of the opinion that she knows better than everyone else what should be done and how it should be done, and that this attitude has caused her to behave in a manner inconsistent with her responsibilities as a New York City teacher. Her behavior towards C.S. and her mother, argues the Department, was motivated by her own agenda, and in pursuing that agenda, she exhibited frustration and fury towards a student and her parent. The Department rejects the assertion that this case is somehow retaliatory, noting that the whole matter was initiated by a parent complaint, not by the administration, and further noting that a pending lawsuit which Respondent points to as part of the retaliatory motive is grounded in things that occurred under the prior principal and has nothing to do with Mr. Karakas or the current administration.

The Department stresses Respondent's failure to acknowledge any fault in any of this. She consistently finds someone else to blame, according to the Department, including the school for placing C.S. in her class, the administration for not understanding her, and even Ms. Owens-Dingle for not being the right kind of mother to appreciate Respondent's actions towards her and C.S. It urges that she has allowed her personal agenda to trump the way she conducts herself when interacting with students as well as family members, and avers that there is no training that

will alter her behavior if she has not already learned how to act appropriately in her over 20 years of experience. It urges that I terminate her employment.

## CONTENTIONS OF THE RESPONDENT

Respondent argues that this case is grounded in a mistake, and insists that had that mistake not occurred, Respondent never would have ended up confronting 3020-a charges. Respondent refers to Owens-Dingle's mistaken belief that Respondent failed to forward documents which she was given on to the SBST, creating an impression that Respondent did not really have C.S.'s best interests at heart, and thereafter prejudicing Owens-Dingle's view of her. She points to the Department's withdrawal of an original Specification regarding the forwarding of the documents, and suggests that Owens-Dingle was misinformed, perhaps intentionally, by others in the administration, and that she may not have even known the truth at the time she testified at trial. She urges that everything else which occurred here, and specifically Owens-Dingle view of her, is colored and tainted by this mistaken belief, and that there is nothing other than this in the record that would have changed Owen-Dingle's initially held view that Respondent cared for and was working in her daughter's interests. With this piece removed from the narrative, Respondent argues that the case against her must fail.

Respondent asserts that she did not harass nor pester anyone, but even if she did, asks whether that is wrong if you are doing it in an effort to help a child? Respondent posits that her pushing for services for at least two children at P.S. 195, knowing there was a backlog in attending to such matters, led her to be seen as a meddler and a nudge in the eyes of the administration. This view, says Respondent, was reinforced by the fact that Respondent had, in the past and presently, filed complaints about the school's failure to provide mandated services, and she concludes that the administration saw her as someone who stuck her nose where it didn't belong, and who saw herself as judge and jury. But, she continues, that is not what she is

11

charged with, but rather, she has been presented with a mishmash of attempts to characterize her as someone who is purely self-interested and probably out of control.

Respondent addresses the credibility of Ms. Owens-Dingle, and suggests that in many respects she was highly credible, praising her ability to admit that she was disappointed with many other people besides Respondent, but insists that much of what she thought and how she reacted was rooted in the misinformation she received about the documents. She flatly denies saying some of the things which Owens-Dingle attributes to her, but accepts that much of it was an exaggeration, an expression of anger because she believed Respondent had not done what she said she would do in delivering the documents. Owens-Dingle could not, however, in Respondent's view, acknowledge that anger, because she was smart enough to know that admitting anger might suggest ulterior motive, might make her testimony lose the ring of truth. Respondent points to the episode in the hallway, one which she claims was fabricated by Owens-Dingle, as an example of her exaggeration, asking how she could say that she could have had Respondent arrested for that encounter, when all Respondent did, she says, is express concern for C.S.

Respondent insists that this case is motivated by the administration's own failures, for which they found Respondent to be a convenient scapegoat. She addresses each of the Specifications in turn (see Discussion below), and concludes that she has been targeted because she made complaints about what was going on in the building, and that the administration attempted to make the case against her by lying to an aggrieved mother. She sees both herself and Ms. Owens-Dingle as pawns in the school's effort to shore up its defenses against an ongoing state investigation into what it does or does not do with kids who should be evaluated to receive special services. It sees a venal, mean-spirited, bad faith effort by the administration to cover its tracks a more likely scenario than a 26-year veteran teacher, without a single letter to

file until the year in question, suddenly snapping. She maintains that this is the only way to make sense of and harmonize Respondent and Owens-Dingle's experiences, and asks me to consider this in reaching my conclusions.

## **DISCUSSION**

Before turning to the individual Specifications in this case, two matters require discussion up front. The first is the matter of the relative credibility of Respondent and Ms. Owens-Dingle, insofar as their stories directly contradict each other when it comes to the vast majority of the charges herein. The second is the foundational premise of Respondent's argument, i.e. that none of this would have happened had Owens-Dingle not been mistaken about Respondent's delivery of documents to the SBST.

Respondent suggested that Owens-Dingle testimony was to be both credited and discounted. She praised her forthrightness when she admitted that she was disappointed in many people in the administration of P.S. 195, not just Respondent. But she questioned the accuracy of her views when it came to pretty much everything else, reasoning that she had been misled and was understandably angry, considering what she thought Respondent had done in not delivering the documents to the SBST.

In other words, Respondent would have me believe that an otherwise honest woman was driven by anger and disappointment to fabricate stories out of whole cloth about Respondent's interactions with her. And I should not be fooled by her refusal to say that she was angry, because this otherwise honest woman was apparently clever and manipulative enough to know that saying she was angry would undermine her effort to get me to believe her lies.

I find nothing in Ms. Owens-Dingle's demeanor, attitude or answers during her testimony in this case that allows me to reach any of the conclusions Respondent urges me to reach about her. She was a thoroughly credible witness who felt it important to come in and explain why she

13

had been so distressed by Respondent's actions towards her. Yes, she admitted that she also blamed other school officials for their failures on behalf of her daughter, but she was able to clearly isolate Respondent's actions, and sought to hold her accountable for just those.

By contrast, after a careful review of the record, it is difficult to believe most of what Respondent had to offer in her testimony. There are many reasons for this, some of which will be discussed in connection with the individual Specifications below, but a prime example lies in a comparison of her testimony to the assertions she made in writing in her rebuttal to Principal Karakas dated December 21, 2015 (D2C). For example, she says in the rebuttal that the actual number of calls she made to Owens-Dingle was 3 or 4, but she testified that it was "maybe twice" (T. 405). She wrote that when Owens-Dingle expressed reservations about the calls continuing, she immediately stopped them. At trial she testified that she was never asked to stop calling (T. 485).

It is also difficult if not impossible to reconcile many aspects of Respondent's testimony, such as her statements suggesting that she knew C.S. as a student, yet at the same time explaining that there was not a day that she was able to enter the classroom, and "every day" she had to call for assistance which resulted in C.S. being taken somewhere else for the remainder of the day. She witnesses a "horrendous" incident with Slattery but, moments later, calls him for help, and never reports the incident to anyone. She witnesses the identical horrendous behavior two days later, this time at the hands of Anna Rodriguez, presumably moving the child into the classroom and holding the door so she could not leave. But the record contains a discussion of Anna Rodriguez' role in the school, and there is nothing to suggest that she would ever have been given the task to walk C.S. to the room and take this kind of action to insure that she stayed in the room. Absolutely nothing. And again, she did not report what she deemed to be horrendous behavior, but was unable to explain her failure to do so. Other statements similarly

14

lack credibility – that Owens-Dingle did not recognize her name on the phone, even after all the intensive efforts that Respondent tells me she was making on behalf of her daughter. She suggests that Owens-Dingle was upset because of the events of that day, when she says C.S. was hospitalized, but I find it interesting that nowhere in Owens-Dingle testimony did she, or anyone else for that matter besides Respondent, ever talk about this happening. In fact, when Owens-Dingle testified about the conversation with Respondent that night in which she was told that something had happened with C.S. during the school day[7], she asked C.S. if anything unusual had happened in school the day and she said no. There was no indication that C.S. had been hospitalized or that Owens-Dingle had any reason to think anything unusual had even occurred at school. And it strains credulity that, after three weeks of this daily emotional scene created by C.S., she was neither frustrated nor distracted, particularly when you consider that she insists she was on an unsuccessful mission to get the school to address C.S.'s needs.

In addition to finding Owens-Dingle to be the more credible witness here, I also find that Respondent's reliance on the premise that all of this stemmed from Owens-Dingle mistaken belief that the documents had not been delivered to be an overreach on the issue. Owens-Dingle, while mentioning the documents once or twice in her testimony, consistently stated that this all started with what she understood to be Respondent's behavior in the classroom on September 30, when Althea Anderson dropped C.S. off to school. And in fact, that would have to be where this all started. Owens-Dingle brought the documents to Respondent on September 25, and Respondent sent them on to Graham on September 27. Respondent testified that she told Owens-Dingle the next day that she had done so. There is nothing in the record to suggest that by September 30, two days later, Owens-Dingle would have had any reason to think that was not

---

[7] Respondent described a scene in the main office where, she said, an upset C.S. was passed from lap to lap while crying hysterically, and her understanding that C.S. was hospitalized later that day. Owens-Dingle testified that Respondent referred to something which had occurred, but would not tell her what unless Owens-Dingle told her what administration had said about her. Respondent denied that exchange.

the case. And indeed, when she went first to LaFontaine and then Karakas on September 30 to complain about what had happened, she did not mention the documents. Her complaint was about what happened in the classroom. A month later, when Karakas met with her again to discuss further complaints lodged by Owens-Dingle, he does not make any finding about the documents or even discuss them other than to say, at the very end of the letter, that documents collected should be referred to the SBST and not held for her own records. There is no reference to Owens-Dingle making an issue of this.

So while I accept that Owens-Dingle was, at some point, misinformed about Respondent's actions, I do not see it as the same critical juncture which Respondent urges it is. Respondent argued, in fact, that Owens-Dingle was told that Respondent's failure to deliver the documents was the whole reason the entire process was failing her and her daughter. There is no basis for such an assumption in the record, and nothing in Owens-Dingle testimony to suggest that she was told Respondent was solely responsible for what was happening, or not happening, with C.S. If that were the case, I would have expected Owens-Dingle to place far more emphasis on it in her testimony, especially if she still believed it to be the case at the time of trial, as suggested by Respondent. But she did not solely hang her hat on that point when accusing Respondent. Far more often, she mentioned the incident in the classroom on September 30 as the beginning of her concerns, and the timeline supports that view. If the document mistake was as critical as Respondent repeatedly asks me to believe that it was, and Owens-Dingle still believed it, why would she not stress that this was her main issue with Respondent?

With these matters in mind that I turn to the individual Specifications in the case.

## SPECIFICATION 1

These charges involve Respondent's conduct on September 30, 2015, when Althea Anderson brought C.S. to school, and she was unable to enter the classroom. In the absence of

testimony from Althea Anderson, the Department asked me to give credit to the hearsay testimony of her account of what occurred, which appears in the record through the testimony of both Owens-Dingle and AP LaFontaine.[8] The Department argued that when Althea called her mother from the hallway in the midst of the incident, she was conveying a present sense impression of what was happening in the moment, and also making an excited utterance. These two recognized exceptions to the hearsay rule posit that when one makes an utterance under such circumstances, they have not had an opportunity to consider their remarks or obfuscate the truth. I agree, in this case, that there is ample, reliable evidence in the record as to what Anderson said to Owens-Dingle. But in the absence of Anderson's testimony and the opportunity to cross-examine her, there is insufficient evidence as to whether what she told her mother accurately reflected what was going on, and whether she fully understood what was happening, as there is nothing to suggest that this was anything other than her first time trying to bring C.S. to school.

That being said, the absence of Anderson's testimony impacts only the statement charged in Specification 1(B). The conduct charged in the remaining sub-Specifications was all admitted to by Respondent. Her defense is that there was nothing wrong with what she did. I disagree.

Respondent admits that she did not take C.S. into the classroom, but explains that this is what happened virtually every day, that C.S. refused to come in and that she attempted to follow the protocol that had been put in place whereby she would call Ms. Graham or Mr. Slattery to come help. On this day, however, when she could not reach either of them, she sent C.S., with her sister, down the hall to Anna Rodriguez who was asked to find Ms. Graham. There is no evidence that this is a course of action that was ever pursued before.

Respondent's explanation is an abdication of her responsibilities as C.S.' teacher. Yes, the child was difficult and yes, there was a protocol in place to help with the situation. But when

---

[8] Principal Karakas also reiterated the same account, but in his case it was told to him by only Owens-Dingle, making it double hearsay, whereas Owens-Dingle and LaFontaine both heard the account from Anderson directly.

that protocol failed, C.S. remained Respondent's responsibility. There was a de-escalation policy in place which required Respondent to make additional efforts, in particular, calling the main office, to address the situation. Respondent said that she did not do so because it was her experience that when calling the main office, a family worker answers the phone and says that the administrators are all in a meeting, so she saw no point. That is absurd. To assume that no help would be forthcoming is counter-productive and defeatist. Respondent herself testified to another situation where, when Graham and Slattery were unavailable, she called guidance counselor Levin and Dean Gonzalez for help. There were other alternatives. And if she believed no help would be available, then what was she expecting Ms. Rodriguez to do? Instead of meeting her responsibilities as C.S.'s teacher, she sent her down the hall to a school aide whose first response to her was "I don't know anything about this." What did she think would happen if Rodriguez could not find Graham, or was told that the administrators were all in a meeting? Respondent said she had a responsibility to the other students in the class, but she also had one to C.S., and until she fulfilled it, she had no business dismissing her into the hands of someone clearly not equipped to handle the situation, and certainly not without exhausting all other possible options. She argued that she could not leave her other students, but no one is suggesting that she should have – there were other things she could have done, none of which required her leaving the room. Nor am I drawn to any other conclusion by the fact that C.S. walked down to Rodriguez with her sister. It was not Anderson's responsibility to address this situation, and while I am grateful that C.S. was accompanied, the question is about the propriety of transferring her responsibility to Rodriguez, regardless of Anderson's physical presence.

In the absence of Anderson's testimony, I cannot find that the Department has met its burden regarding the statement charged in Specification 1(B). Specifications 1(A), (C) and (D) are sustained.

**SPECIFICATION 2**

This Specification charges that Respondent called Owens-Dingle repeatedly and after being asked to stop by the parent. As discussed above, Owens-Dingle's testimony was completely credible on this point, in contrast to Respondent whose testimony was at odds with her own written rebuttal.

Owens-Dingle did say that many people from the school called her home, but she was not confused about Respondent's calls and what she said. While she said she received up to six calls a day from various people at the school, she did not say that Respondent called her with that frequency. She clearly distinguished the calls from Respondent, and indeed it makes sense that she would recall them specifically since, as she said, Respondent was talking about herself and her issues with the administration rather than C.S. or her well-being. I also see no reason why, if she had called only twice, and only to inquire about C.S.'s well-being, that Owens-Dingle and her husband would have found it necessary to come to the school and lodge a complaint of harassment for no reason. I simply do not credit Respondent's denials.

Specification 2 is sustained.

**SPECIFICATION 3**

Respondent is charged with saying to Owens-Dingle, in the presence of others, words to the effect of "your daughter has mental problems." The record is clear that there was an impromptu conversation between the two within the first few days of class which led to Respondent setting up a meeting with Owens-Dingle to further discuss C.S.'s needs. Owens-Dingle said that Respondent asked about her daughter's issues and indicated that she had experience with problems of this sort and could help. When Owens-Dingle realized there were other parents around, she asked if they could talk about it some other time. Respondent denies that anyone else was around.

When Owens-Dingle testified about this encounter, she did not seem particularly disturbed by it. She was focused less on the language used by Respondent then she was at explaining why, at the very beginning, she came to trust Respondent, because she expressed an interest in C.S. and said she could help. If, in fact, there were people around, I believe that having this conversation in front of them was inadvertent on Respondent's part. No one else who may have been around testified that they overhead, in any event. Owens-Dingle said that when she pointed out to Respondent that she wasn't comfortable talking about this with others around, Respondent apologized and said she hadn't noticed. Although Respondent was unwilling to admit this, and while it may have been somewhat careless, I do not find any misconduct in her taking this opportunity to strike up a conversation with Owens-Dingle to see if there was a way she could help C.S.

Specification 3 is dismissed.

**SPECIFICATION 4**

This Specification is drawn from the incident in the hallway. Owens-Dingle testified credibly about the encounter, and I can find no reason why she would fabricate a conversation of this nature. The Department argued that the only way Owens-Dingle would know that Respondent was accusing Anderson of lying is if she actually spoke these words to her as charged. Respondent suggests that someone in administration told her, thereby accounting for the nature of her fabrication, but there is simply no support for such a theory. Moreover, Respondent admits that she did mention to Owens-Dingle that she had been admonished in some way – she told her she had been "written up" by administration -- but asks me to believe that she mentioned this casually while inquiring about C.S.' welfare. This doesn't ring true, especially when she points out that she was still shocked and upset by the meeting just a day or

two earlier. It is easy to believe that she would take issue with the account of the person that was responsible for her being "written up."

Respondent also points to C.S.'s request to return to Respondent's classroom, even after this encounter, as evidence that it could not have occurred as charged, opining that no child would have wanted to return to the classroom of a teacher who had just interacted with her mother in this way. C.S. did not testify and there is no way to know exactly what was in her mind, but the record does reflect two things: one is that she did express concern to her mother about the incident in the hallway (T. 170); and two, that the request to return to Respondent's classroom was made because the other classroom she was moved to – and which the timeline suggests she was in for only one day – was an even more inappropriate and uncomfortable setting for her than Respondent's class. Regardless, when she went back to Respondent's class the following day she refused to enter, never made it into the room, and never returned again.

Owens-Dingle testified clearly that Respondent made the statements in sub-Specifications A, B, C and D, and these sub-Specifications are sustained. Sub-Specification E is merely a reiteration of D, and is dismissed as duplicative.

As to sub-Specification E, although there is anecdotal evidence throughout the record that Respondent was focused on some wrongdoing she perceived on the part of the school, there is insufficient record evidence to support the charge that Respondent made these precise statements. Sub-Specification F is therefore dismissed.

**SPECIFICATION 6**

This Specification involves Respondent's decisions to have the students in her class craft get well cards and send them to Owens-Dingle, along with a home schooling application, approximately three weeks after C.S. had stopped coming to school. The sub-Specifications touch on all aspects of these decisions, including the allegation that Respondent told the students

that C.S. was sick when she was not in fact sick, thereby violating her right to privacy, using classroom time inappropriately, causing confusion and upset in C.S.'s household, and purporting to act on behalf of the administration in sending the home schooling application, despite doing so without its approval.

Respondent, in her written rebuttal to these allegations, called them charges "against kindness, and aside from being mean-spirited . . . create a chilling effect against expressions of warmth, love and humanitarian concern in educational settings" (D2C). She continued, and affirmed at trial, that the cards were inspired by classmates' unprompted concerns for C.S. who had been mostly absent from school and who they knew was "under great sadness and distress manifested by her uncontrolled crying episodes in the classroom." She insisted, both in the rebuttal and at trial, that no classmates were informed of the reason for C.S.'s absence, whether health-related or otherwise. In the rebuttal, she concluded that

> this self-motivated gesture of human concern and caring that I assisted the class in coordinating after her classmates inquired if there was anything they could do for [C.S.] encompasses the kind of event that usually generates kudos for the heartwarming better side of the human nature. The expressions of love and caring in the cards are truly moving, and when recreated in a family movie, usually brings most of the audience to tears. I don't know what mother would not be emotionally moved by receiving such beautiful expressions of affection and caring for her child, or what kind of school would not find this to be praise-worthy in their young students and a guiding faculty member, as opposed to the basis for disciplinary charges.

(D2C at p. 3).

Respondent argues that the charge borders on the frivolous. It was not, she observes, confidential information that C.S. was absent from school. The notion, she maintains, that this gesture is somehow violative of a family's privacy rights is startling when, she insists, there is no

evidence that Respondent said anything to the class about C.S.'s medical condition beyond that she was "not feeling well" and offered the cards as an opportunity to cheer her up. We are living in a topsy-turvy world, she posits, if this amounts to misconduct, even if Owens-Dingle found it offensive. She continues that there is no showing that taking the time to do this was somehow violative of school curriculum, and in any event, she explained that they were made during leftover time which was created when they had to leave their classroom due to a toxic odor.

The Department stresses that Respondent's decision to send these cards happened after Owens-Dingle had asked her to stop calling her home, and after their encounter in the hallway. It posits that she sent the cards as a way of finding out what was going on between Owens-Dingle and the administration, and of getting information that she felt she was not getting from the administration. By stating that she did not know what mother would not be moved by such expressions of affection and caring for her child, she completely ignored what was going on between her and C.S.' mother, and sent the cards to further her own agenda.

These charges are troubling if, as Respondent urges, they are nothing more than a mean-spirited effort to criticize her for making a kind and humanitarian gesture. There can be no broad finding that the sending of get well cards is misconduct per se. But the context in which it was done, and the disregard which Respondent showed for both C.S. and her mother's interests, is disturbing at best.

Respondent insists that the whole episode was initiated by children asking where C.S. was and why she hadn't been in class. There is no other direct evidence to either support or contradict that assertion. No students testified at trial, but transcripts of AP LaFontaine's interviews of four students who sent cards appear in the record at D2B. Together they support the notion that Respondent both told them that C.S. was sick, and suggested that they send get well cards, but they do not illuminate how the conversation was initiated. The whole matter,

however, is very peculiar. According to Respondent, C.S. had difficulty entering the classroom virtually "every day," and was taken away to spend the day with either Graham or Slattery. She was last seen struggling to enter the classroom on Oct. 8. There is little to suggest why the students would suddenly, on or about October 27, express concern about this student who they, apparently, barely knew and had not seen for almost three weeks. But there is a great deal to suggest as to why Respondent would be looking for a way, at that time, to connect with Owens-Dingle. From September 30 forward, there had been tension between the two, and an ongoing effort by Respondent to wrest information of one sort or another from Owens-Dingle. After numerous and eventually unwelcome calls to the home, Respondent was asked to stop calling. These cards created an opportunity to get Owens-Dingle's attention again.

While concluding that the cards were nothing more than a ploy to regain access to Owens-Dingle requires some speculation, it requires none to say that Respondent ignored the possible ramifications of her actions. To begin, whatever it is she told the students – whether she said C.S. was "not feeling well" or that she was "sick," the students were clearly left with the understanding that she was, in fact, sick. This is obvious from the content of the cards themselves, which are in the record at D3, and corroborated by the transcripts of the student interviews. I find it almost astonishing that this teacher, who held herself out both to Owens-Dingle and to this tribunal as someone who has experience dealing with children with special needs and knew a great deal about how to help such children would willfully create the impression, in a group of six year-olds, that someone experiencing the emotional difficulties of separation anxiety and ADHD with which C.S. was struggling should be branded as "sick." Whether or not she consciously made and then ignored that connection, it was negligent to foster that notion among these students. Looking at it from that perspective, it is easy to understand why Owens-Dingle and, according to Owens-Dingle, C.S. herself, were perplexed and upset by

the cards.  And while I don't find any violation of HIPAA laws or anything of that nature, I do believe that in disseminating misinformation about the student, Respondent clearly violated her privacy and right to confidentiality on some level.

The Department is also correct when it argues that Respondent totally ignored what was going on between her and Owens-Dingle at the time she sent the cards.  Although she adamantly denied harassing Owens-Dingle, I have found in connection with both Specifications 2 and 4 above that the evidence supports a finding that she did, in fact, do just that.  Although her story changed from place to place, she asserted at least once that Owens-Dingle did not want her to continue calling the house (D2C).  Even assuming the best of motives, she knew that her continued insinuation of herself into this family's affairs was not welcome.  To then create an impression amongst her students that C.S. was sick and have a FedEx package delivered to the home, including a personal note from herself to Owens-Dingle asking if she can be of any further help, indicates that she had no regard for Owens-Dingle's desire to halt communications between them.  Yes, it is dressed up as a "humanitarian" effort which, if genuine, would certainly not be a basis for misconduct.  But in the context of this entire record, I do not believe it to be so.

Based on the foregoing, I find there is adequate basis to sustain Specifications 6A, C and D.  There is insufficient predicate in the record regarding the improper use of classroom time as it relates to the school curriculum, and Specification 6B is therefore dismissed.  As to the home schooling application included in the package, the gravamen of Specification 6E is the indication that Respondent included a note stating "as per administration" when, in fact, there had been no such approval for Respondent sending that application emanating from the school.  The note, however, was not available for production at trial, and in its absence, I find the Department did not meet its burden on this point.  Specification 6E is dismissed.

## PENALTY

Respondent has been found guilty of dealing with a student who was crying and/or in crisis inappropriately, harassing that student's parent by calling her repeatedly at home in the evening, even after being asked to stop, confronting her publicly in an intimidating fashion, and sending a package to her home which she had reason to know would be unwelcome in light of ongoing tensions between them. These findings come in the face of strident denials by Respondent and the vigorous argument that she never did anything more than try to advocate for this student in the face of an administration who was not doing their part to meet her needs. Having found those denials not to be credible, the only question which remains is that of penalty.

The record contains reference to a lawsuit which Respondent has pending against the school. Although the details of that lawsuit are not part of this record, the nature of it was revealed in Respondent's assertion that these charges were in some way retaliatory for the lawsuit. She apparently has complained about what she sees as the school's failure to adequately respond to children with special needs in getting them evaluated and provided with the services they require. When she started pressing the administration about finding a proper placement for C.S., knowing that the administration was experiencing a backlog in this area, she argued that this was seen as more "meddling" which the school could not tolerate, leading to the charges and this proceeding. She insisted repeatedly at trial that she never had anything but C.S.'s best interests at heart.

I do believe that Respondent cared about what happened to C.S., and that she cares about her students generally. Although she is not a Special Education teacher, and although I know little about the pending lawsuit, I accept that she feels strongly about this or any administration's commitment to children with special needs. The question in this case is one of the proper

manner in which to express and pursue those concerns, and this case is replete with evidence that Respondent crossed the line in her interactions with C.S. and Owens-Dingle.

Owens-Dingle testified regarding a number of statements which, although uncharged, provide some context for those interactions, including the phone calls and the comments in the hallway. She indicated that Respondent seemed fixated on what was being said by the administration, told her she was investigating the school and wanted information, and once on the phone offered that she knew something about an incident with C.S. at school that day but would not tell Owens-Dingle unless she told her what the administration had said in their meeting. Respondent denied all of this, insisting that she never spoke to Owens-Dingle other than to inquire about C.S.'s well-being, but I do not find her litany of denials to be credible. And while these statements are uncharged and do not, in themselves, contribute to the penalty reached in this case, they are important in understanding Respondent's motivation. Whether she was directly trying to gather supporting information for her lawsuit, or just create another pressure point on the administration to do what she believed should be done, there is no question that she overstepped her bounds and that a student and her mother were adversely affected in the process.

Respondent had been told before and was on notice that she was not to aggressively insert herself into the business of the SBST. Karakas explained why:

> We have an SBST team in place to conduct referrals, to make recommendations or special education. Teachers are not psychologists. They can track student behavior. They can track student academic progress, but they are to then let the SBST team make determinations around if a child might have a learning disability. To tell parents that children do have it or will need referrals, can create anxiety. It then comes back to us as--to the administration to try to make parents feel more comfortable around a situation with their children. It just isn't professional to let parents know that a

child needs to be evaluated, so it causes hardship on families. And as administrators, we're constantly trying to ensure that parents feel safe, nurtured, children feel safe, nurtured, that there is open dialogue.

(T. 263).

These then, are the concerns underlying Karakas' instruction to Respondent that she was not to interfere with student evaluations for special services, and to be respectful in her interactions with parents. His notice to her bears repeating, that:

> she is to speak to parents professionally, that she is not to make judgments about referrals without contacting the SBST team and letting them handle referrals, that she is to evaluate children academically, behaviorally, but that she is not the person to make determinations for special education, and again just professionalism with how she speaks to parents.

In dismissing Specification 3, I found that there was nothing unprofessional in Respondent's initial approach to Owens-Dingle, particularly at a time when she did not know exactly what C.S.'s issues might be. But as the interactions with Owens-Dingle escalated, and her statements became more self-interested, she ceased to be what she may have wanted to be – an effective advocate for C.S. – and became fixated on her own agenda. She acted directly contrary to the warning she had been given, and then some. Her statements that she never spoke about anything but C.S.'s well-being are hollow and discredited by the testimony of a mother who, no one could dispute, truly did have nothing but her daughter's interests at heart. She insisted she was fighting for C.S., but when she needed her and no one else was around, she shuffled her down the hall to a school aide. Moreover, if Respondent said and did all the things she asks me to believe, there is no reason to think that Owens-Dingle wouldn't have welcomed her help and appreciated having her as an ally as she became increasingly frustrated with the lack of action on the part of the school in addressing C.S.'s needs. But that is not what happened.

She went from thinking that Respondent was an ally to demanding that she leave her and her daughter alone.

Owens-Dingle did say that there was blame to go around, and although Karakas seemed ignorant of or unwilling to admit that she was pointing the finger at virtually everyone at the school, including him, there is sufficient evidence to conclude that P.S. 195 either did not know how or did not have the proper resources to address C.S.'s particular issues. There is also no question that other people, besides Respondent, contributed to Owens-Dingle's frustration. But whoever they were, and whatever any individual's particular role, their conduct neither changes nor excuses Respondent's. Yes, in the case of the delivery of the documents, it appears Owens-Dingle was misinformed for a time, but that did not drive her decision to lodge a complaint against Respondent as early as September 30. Nor is that error in any way connected to her later complaints about the incident in the hallway and the harassing phone calls. These things either happened or they didn't. Respondent mounted an effort to have me believe that Owens-Dingle made it all up because she thought Respondent dropped the ball with the documents. That is impossible to believe, and Respondent's unwillingness to accept even the slightest bit of responsibility, or to acknowledge that even one action on her part might have been ill-considered, now drives my penalty determination in this case.

Respondent is a veteran teacher. She has strong views about how things should be done, and that is not necessarily, in itself, a bad thing. But when those views cause one to act aggressively, as Respondent did here, without regard to the wishes or sensitivities of a student and her parent, as well as the admonition and directive of her superiors, then they cease to be praiseworthy.

When considering termination of a teacher, I am obliged to consider whether I believe there is some prospect that, if returned to the classroom, that person's behavior will change. I

29

have no reason to so conclude in this case. Respondent has denied doing anything wrong. She has blamed anyone she could point to, including Graham, Karakas – she even, in so many words, accused Owens-Dingle of being a bad mother, and accused her of being a blatant liar. She has dramatically attacked the motives of everyone around her, without a moment of introspection about her own actions. When asked if she could return to the hierarchy of P.S. 195 she said no, she had been treated unjustly and the environment was toxic. When then asked if she could work anywhere else, she said that would depend on whether the people there judged her only on her work and ability in a fair and just way. While one would always hope that would be the case, she said not a word about what she would do or any changes she would we make to insure a smooth working relationship in the future. Instead, she created the pre-supposition that, if anything goes wrong at her next position, it will be because of the failure of the people there to be the kind of administrators she thinks they should be.

It is always difficult to terminate a teacher of long-standing, but I can find no basis on which to continue Respondent's employment with the Department. Her defiance of her administrator's warnings to her, her abdication of her responsibility to her student, her harassment of a parent, her failure to acknowledge any wrongdoing, and her complete lack of remorse lead me to only one conclusion. Respondent's employment with the Department is hereby terminated.


## **CONCLUSION**

By reason of the foregoing, I hereby issue the following

## AWARD

1.  Respondent is guilty of the conduct charged in Specifications 1A, 1C, 1D, 2, 4A, 4B, 4C, 4D, 6A, 6C and 6D.

2.  Respondent is not guilty of the conduct charged in Specifications 1B, 3, 4E, 4F, 6B and 6E.

3.  As a penalty for the misconduct found in paragraph 1 above, Respondent's employment with the Department is hereby terminated.

Dated:    August 15, 2016

LISA BROGAN, Hearing Officer

## AFFIRMATION

I, Lisa Brogan, do hereby affirm upon my oath as Hearing Officer, that I am the individual described in and who executed this instrument, which is my Opinion and Award.

Dated:    August 15, 2016

LISA BROGAN

31