SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X
In the Matter of the Application of

ANNA DENICOLO                                              Index No.:

                    Petitioner,

For an Order Vacating The Opinion and Award of a                 VERIFIED PETITION
Hearing Officer Pursuant to Section 3020-a(5) of the            PURSUANT TO ARTICLE
Education Law and Article 75 of the CPLR                        75 OF THE CPLR

          -against-

THE BOARD OF EDUCATION OF THE CITY OF
NEW YORK AND/OR THE NEW YORK CITY
DEPARTMENT OF EDUCATION OF THE CITY
OF NEW YORK

                    Respondent.
-----------------------------------------------------------------------X

       The Verified Petition of Anna Denicolo for an Order Vacating the Opinion and Award of

a Hearing Officer Pursuant to Section 3020-a(5) of the Education Law and Article 75 of the CPLR

respectfully shows to this Court as follows:

      1. Anna Denicolo (hereinafter "Ms. Denicolo" or "Petitioner") resides at 18 Wildwood Road,

Apartment 5B, Hartsdale, New York 10530.

      2. The Respondent is the New York City Department of Education (hereinafter

"Respondent") whose place of business is 52 Chambers Street, Room 320, B4, New York, New

York 10007.

      3. This matter is timely before the Court, the decision dated August 15, 2016 and such

proceeding is being commenced within 10 days.

4. Several exhibits are attached hereto. Exhibit "A" is the Opinion and Order of the hearing pursuant to Education Law §3020-a; Exhibit "B" is a set of all of the transcript testimony from the hearing; and Exhibit "C" is all of the exhibits that were presented at the hearing below.

## PRELIMINARY STATEMENT

5. Anna Denicolo has been teaching for 26 years and prior to the events herein has had no charges or findings of misconduct. She holds bachelor's degrees in criminal justice and behavioral science, and a master's degree in education, Pre-Kindergarten through sixth grade. Exhibit B at 339-340. Ms. Denicolo further has a certification master's in school building leadership and credits and a recommendation towards school district leader. Id. She has had a lauded teaching career, and prior to the events in question, had been teaching at P.S. 195 for five years.

6. At P.S. 195, she was a first grade teacher in September 2015 when she was thrust into an impossible situation. Her general education class of 32 students, with no assigned paras or aides, included a child, C.S. with profound difficulties. The child had severe separation anxiety, ADHD, emotional outbursts, and was not able to thrive in the environment of a general education class. Exhibit A at 4. From the beginning of the school year, the child's difficulties were so manifestly apparent that a protocol was put in place whereby when the child arrived at the class and would cry inconsolably and be unable to separate herself from her mother, that the social worker, Ms. Graham, or the Dean, Mr. Slattery, would physically take the child for the day. Exhibit A at 4. Thus, the child's needs were not met in a general education class; nor was the child provided an optimal alternative setting. Recognizing this, Ms. Denicolo tried to have the child's needs met by collecting the medical documentation from the family, speaking with the mother, and sending the information to the administrators. Exhibit B at 363-364. The school did not evaluate the child nor tend to the

2

child's needs, then covered its failure by informing the mother that Ms. Denicolo never provided the documentation to the school. Exhibit B at 187. It is noteworthy that one of the specifications charges (specification 5) was that Ms. Denicolo "on or about and between September 1, 2015 and December 14, 2015, [Ms. Denicolo] failed to follow school protocol in that [she] failed to forward documents regarding special education evaluation for Student A received from Student A's parent, to the administration and/or the School Based Support Team." Ms. Denicolo submitted irrefutable e-mails confirming that the child's information was passed to the appropriate school Administrators and the specification then had to be withdrawn. Notwithstanding Respondent's error in characterizing Ms. Denicolo's conduct to the parent, even at the time of the hearing Respondent did not inform the parent of their misinformation. Exhibit B at 187. Such misinformation directly impacted, caused, and contributed to the witness's negative perception of Ms. Denicolo.

7. In this environment, on September 30, 2015, Ms. Denicolo was teaching her class when C.S. appeared late and unannounced with her older sister. As before, the child was inconsolable and would not come in the classroom. Ms. Denicolo, while remaining in the room with the other 31 children she was responsible for, proceeded to try to invite the child in, and when that proved to be unsuccessful, called Ms. Graham and Dean Slattery. Neither person answered their phone. Standing between 31 first graders in the middle of instruction and a crying child whose de facto support team was unavailable, Ms. Denicolo called to the aide down the hallway to see if she could further try to contact the support team. The aide escorted the child to Ms. Graham.

8. For being unsuccessful in having C.S. enter the classroom on September 30, 2015, being unable to reach the Dean or the social worker and utilizing an aide to get further assistance, for later calling the parent, speaking to the parent in the hallway, and sending the child get well cards

3

from the class, Ms. Denicolo was found to have verbally harassed the family and had her 26 year career terminated.

9. Thus, the P.S. 195 administration was aware from the beginning of the school year that C.S. had difficulties that prevented her from learning in Ms. Denicolo's class and it was rare that the child was even able to stay in the class without being taken by the social worker. Ms. Denicolo was given no additional support other than to proceed to call the social worker when the child would have emotional episodes. With no other support and a classroom full of other children she was required to teach and maintain safety for, Ms. Denicolo was left in an impossible position on September 30, 2015 when the social worker and Dean were unavailable. The course she undertook after C.S. would not be calmed and persuaded to enter the classroom, in asking the aide to call for assistance, was reasonable under the circumstances and the child arrived safely to the social worker.

10. After the above events, Ms. Denicolo had occasion to see the mother of C.S. in the hallway with the child. The mother's account of the interaction is that Ms. Denicolo tapped her on the shoulder, told her that she had been written up, and that her adult daughter, Althea Anderson, had lied in her account of events from September 30, 2015. Ms. Denicolo's account is that she asked how the child was faring and mentioned she had been written up. Exhibit B at 386. The mother claimed that the child was so traumatized by the events that she withdrew from attending school yet also admitted after these events the child asked to return to Ms. Denicolo's class. Exhibit B at 173, 188. The Hearing Officer's finding that C.S. was traumatized by the events herein is inconsistent and irreconcilable with mother's admissions that the child specifically asked to return to Ms. Denicolo's class.

4

11. Ms. Denicolo had occasion to call the mother of C.S. at home. The testimony varies from Ms. Denicolo to the parent on the subject of the conversations. Ms. Denicolo expressed calling to inquire after the child's health and wellbeing. Exhibit B at 402. The mother testified that Ms. Denicolo called regarding the events of September 30, 2015 and to see what the parent had told the administration. Exhibit B at 174-175. The Hearing Officer credited the testimony of the mother. Testimony also varied about the number of phone calls. Ms. Denicolo's testimony and telephone records indicate two phone calls. The mother testified there were four or five phone calls. Exhibit B at 175. The Assistant Principal believed the mother had previously said six or seven phone calls. Exhibit B at 113. The Assistant Principal testified she was unsure when the phone calls stopped. Exhibit B at 108. At some point the parent requested for there to be no further phone calls and Ms. Denicolo complied with such request. Exhibit B at 108-109.

12. The last event charged to Ms. Denicolo is that she violated the privacy of C.S. and verbally abused her by allowing the student's classmates to send C.S. get well cards when the child was absent for a prolonged period of time. Throughout the record it is clear that sending cards is not prohibited in any guideline or statute. In fact, according to the Hearing Officer, depending on the motive of the sender the cards can actually be a humanitarian gesture. The Hearing Officer capriciously and arbitrarily made an assumption based upon uncharged statements that Petitioner wanted to gather evidence against the school of the school's failure to meet children's special needs to determine that the motive of Ms. Denicolo in having the cards sent was of the most malicious variety—she simply used the cards as a ploy to invade the family domain. This perspective as the Hearing Officer admits is entirely speculative. It is without a rational basis or support in the evidence and such finding should be vacated.

5

13. Petitioner is a tenured teacher who was employed by respondent for 26 years without a prior disciplinary history.

14. In 2016, she had six charges and specifications brought against her by Respondent.

## NATURE OF THE CHARGES AND BASIS OF RELIEF REQUESTED TO VACATE OPINION AND AWARD

15. Petitioner seeks to vacate the Order and Award of Hearing Officer Lisa Brogan who terminated her on August 15, 2016 pursuant to Education Law §3020-a.

16. Where parties have submitted to compulsory arbitration, including the Education Law §3020-a process, judicial scrutiny is stricter than that for a determination rendered where parties have submitted to voluntary arbitration. Lackow v. Department of Educ. Of City of N.Y., 51 A.D.3d 563 (1st Dep't 2008).

17. The decision in the Education Law §3020-a hearing must be in accordance with due process, supported by adequate evidence, and must also be rational, satisfying the arbitrary and capricious standards outlines in CPLR Article 71. Lackow *supra*; Motor Veh. Mfrs. Assn. of U.S. v. State of New York, 75 N.Y. 2d 175, 186 (1990).

18. Petitioner's bases for seeking vacation of the award are that the findings without sound basis in reason and without regard to the facts. Matter of Pell v. Board of Educ. Of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 N.Y.2d 222, 231 (1974). Furthermore, the penalty imposed even accepting the findings of the Hearing Officer is so disproportionate to the offense as to be shocking to one's sense of fairness. Matter of Pell *supra*. The Hearing Officer's findings and penalty should be vacated for the following reasons:

(a) Matters considered by the Hearing Officer that were not properly before the
Court including ongoing litigation that Petitioner has against Respondent,

6

uncharged statements, and matters regarding a student who is not the subject of the Hearing;

(b)     Speculation into Petitioner's mindset and motive for sending get well cards by the Hearing Officer which is not supported by the record and which the Hearing Officer admits is speculative;

(c)     Mischaracterization of Petitioner's testimony in finding that Petitioner accepted no responsibility or demonstrated no insight;

(d)     Bias of the Hearing Officer against Ms. Denicolo that resulted in arbitrarily discrediting Ms. Denicolo's testimony;

(e)     Even accepting all of the Hearing Officer's findings as true, the penalty of termination for a first time offense of a tenured teacher with 26 years of experience and no prior charges is excessive and shocks one's sense of fairness.

19. Hearings were conducted at Respondent's office on April 12, 18, 20, and 21, 2016 and a decision was signed on August 15, 2016 terminating Petitioner. A copy of the Opinion and Award is attached hereto as Exhibit "A". A copy of the transcripts in Respondent's possession is attached hereto as Exhibit "B". A set of the Exhibits entered into evidence at the hearings is attached hereto as Exhibit "C".

20. Specification 5 was withdrawn by Respondent.

21. Specifications 1(a), (c), (d); 2, 4(a)-(d), and 6(a)-(d) were sustained. Specifications 1(b), 3, and 6(e) were dismissed.

22. The Hearing Officer's determinations of credibility demonstrate a bias against Ms. Denicolo. The Hearing Officer discredited her testimony based on a prior unsworn statement that was marginally different than her testimony yet accepted as true the testimony of other witnesses

7

whose prior statements are in great contrast to their hearing testimony. Further, the determinations of fact are without reasonable support of evidence in the record. The Hearing Officer's assumptions into Ms. Denicolo's motives for her actions are grounded in speculation, uncharged statements, and unrelated litigation Ms. Denicolo is involved in that is not a part of the record. Even if this Court were to accept the findings of the Hearing Officer, the penalty of termination was draconian under the circumstances and shock's one's sense of fairness.

## FACTUAL SUMMARY OF THE TRANSCRIPTS AND EXHIBITS

### Specification 1

*"On or about September 30, 201, Respondent failed to follow school protocol, in that Respondent:*
*A. Failed to take Student A into her classroom when said student was crying.*
*B. State to Student A's family member who was dropping Student A off at school, words to the effect of: don't have time to deal with her.*
*C. Failed to call the main office and/or ask for assistance from the administration regarding Student A crying.*
*D. Sent Student A to a school aide who is not the appropriate person to be contacted when a student is crying and/or in crisis."*

### C.S. was known by the Administration to have severe anxiety and a protocol was put into place for when the child came to class

23. The charges and specifications sustained herein, involve a student, C.S., such student's mother, and the Petitioner between September 1, 2015 and October 25, 2015.

24. During this time, C.S. was a student in Petitioner's first grade, regular education class at P.S. 195.

25. C.S. as acknowledged by the record, suffered from severe separation anxiety and would face extreme difficulties in separating from her mother and entering the classroom by herself. See Exhibit A at 4.

26. C.S.'s mother testified that the child's behaviors included that "she would stand by the door and just scream and cry and call on the floor." Exhibit B at 166.

27. C.S.'s mother expressed discomfort that that the child would need to be removed from the class to sit with other staff members to calm down and inquired about other alternative settings but was informed by the Administration that Ms. Denicolo's class was on the only one that had space. Exhibit B at 167.

9

28. C.S.'s mother would receive calls from the social worker or other personnel "at least six times a day" that the child cannot focus, is disruptive in class, her safety is a concern, but that they continually stated they could not rush to remove the child from Ms. Denicolo's class and that the child must learn how to remain in school when the mother drops her off. Exhibit B at 168.

29. The record is clear that on most to every school day, the child was unable to be separated from her mother and a protocol was put in place whereby Petitioner would call for assistance from the social worker, Ms. Graham, or Dean Slattery. Exhibit A at 4.

30. Ms. Denicolo would first try to encourage C.S. to come into the classroom, and if she was unsuccessful in getting her to enter, Ms. Denicolo would call the social worker Ms. Graham. Exhibit B at 355.

31. This pattern of events occurred every day for the first few weeks of school up until September 30, 2015. Exhibit B at 355.

**The Hearing Officer ignored the parent's misinformation provided to her by school authorities, such miso-information which even at the time of the hearing was uncorrected and was a source of bias against Ms. Denicolo by the parent.**

32. Petitioner spoke with the mother of C.S. at the beginning of the school year about the child's needs and the mother wished for the child to be evaluated.

33. The mother provided Petitioner with the information for the child to be evaluated and Petitioner forwarded the documents to the appropriate administrative personnel. Exhibit C, Sub-Exhibit R2.

34. Despite Petitioner's appropriate referral, the administration including Ms. Graham erroneously informed the mother that Petitioner had failed to do so. That charge and specification (Specification 5) was subsequently withdrawn by Respondent upon Petitioner's presentation of the e-mail indicating such referral. Despite such withdrawal, at the time of the hearing it is apparent

10

that the parent still labored under the opinion that Petitioner failed to refer her child for services. Exhibit B at 186.

35. When asked who told her that information she indicated, "The staff at the school, the person that needed the paper to actually do the paperwork." Exhibit B at 187.

36. When asked who told her, the answer was "I don't know if I should say the person," Exhibit B at 187. After being admonished by the Hearing Officer to answer the question she informed that Ms. Graham had given her that information. Exhibit B at 187.

37. The mother of C.S. testified that she was upset of this purported and untrue failure of Ms. Denicolo to submit such documents and still believed such untruth to be the reason for her child's delay in evaluation and why the child was out of school for four months.

Q. Yeah. Aren't you angry that you believe that Ms. Denicolo never sent the documents to the right people?

A. I am not angry. I'm disappointed.

Q. Okay, but that's what you're disappointed about.

A.    Yes. I'm disappointed in the whole thing. My daughter had to be out of school for over four months because of people that are unprofessional. Yes, I'm upset about that.

Exhibit B at 192.

38. The mother further testified that when she spoke with Ms. Denicolo on the phone, which is further subject of the hearing herein, that the mother "…was reminding her of **why this even came about to begin with, because of her taking documentations from me that she never gave to the staff**. She never told them I gave her anything. And I had to resubmit those documents in order for the IEP to be done." Exhibit B at 177. [*emphasis added*].

39. In spite of the mother's evident misconception about Ms. Denicolo's actions in having C.S.

evaluated, the Hearing Officer pronounced that

> So while I accept that [the mother] was, at some point, misinformed about [Ms. Denicolo's] actions, I do not see it as the same critical juncture which [Ms. Denicolo] urges it is. [Ms. Denicolo] argued, in fact, that [the mother] was told that [Ms. Denicolo's] failure to deliver the documents was the whole reason the entire process was failing her and her daughter. There is no basis for such an assumption in the record, and nothing in [the mother's] testimony to suggest that she was told [Ms. Denicolo] was solely responsible for what was happening or not happening, with C.S.

Exhibit A at 16.

40. The Hearing Officer's determination above is in direct contrast to the testimony of the

parent as cited in paragraph 39 herein.

41. The mother verbalized her understanding that this entire series of events was due to Ms.

Denicolo not forwarding the information for the child's evaluation. Her understanding is based

upon misinformation relayed by the Administration that even at the time of the hearing was left

uncorrected by the Administration and directly impacted the mother's opinions and feelings

towards Ms. Denicolo.

> **The placement of C.S. in Ms. Denicolo's class did not address the child's needs and placed Ms. Denicolo in an untenable situation in trying to safeguard C.S. and to simultaneously safeguard and teach the rest of the class. There was no ideal way to have addressed this challenging situation and Ms. Denicolo's course of action was reasonable under the circumstances.**

42. Prior to C.S. being placed in Petitioner's class, the mother indicated she informed the

school the child needed services due to anxiety and an inability to sit still. Exhibit B at 162.

43. When C.S. was placed in Petitioner's class, the child's mother spoke with Petitioner and

brought her psychologist's reports and other information for an evaluation. Exhibit B at 165-166.

12

44. It was brought to the mother's attention that the child was frequently not able to sit in class and had to be with a social worker and that they could not remove the child quickly from a class. Exhibit B at 167-168.

45. With the above facts, the child having needs that could not be met by a general education class, the child being unable to be separated from her mother in a way that would allow her to be present in Ms. Denicolo's class on most if not every school day, on September 30, 2015, C.S.'s 22 year old sister appeared with C.S. at Ms. Denicolo's classroom late and unannounced. Exhibit B at 429-430.

46. During this time, Ms. Denicolo was the only teacher in her 32-child classroom.

47. Ms. Denicolo tried to entice the child into the classroom by speaking to her but the child remained on the floor of the hallway crying. Exhibit B at 430.

48. As the child was unwilling to enter the room, Ms. Denicolo proceeded with the established plan for C.S. by calling Ms. Graham and then Dean Slattery, neither of whom were available to answer their phones. Exhibit B at 430, 431.

49. When she could not reach Ms. Graham or Dean Slattery, Petitioner looked in the hallways and saw an aide, Ms. Rodriguez, and asked her if she could call Ms. Graham to assist. Exhibit B at 431. Ms. Rodriguez said she did not know anything about the situation and Ms. Denicolo again asked her if she could call for help to Ms. Graham. Exhibit B at 432.

50. C.S.'s sister then walked with C.S. to Ms. Rodriguez's desk. Exhibit B at 432.

51. Ms. Denicolo did not call the main office as in her experience the main office would refer her to Dean Slattery who Ms. Denicolo had already attempted to contact to no avail. Exhibit B t at 433.

52. Ms. Denicolo heard the testimony of Principal Unal Karakas who said she should have called the main office and in upon reflection, Ms. Denicolo agreed in retrospect she should have also called the main office. Exhibit B at 433.

53. The Assistant Principal Desiree LaFontaine testified inconsistently regarding whether an aide is an appropriate or inappropriate resource for a child. She testified first that a child is never to be left alone with an aide and then changed her testimony that aides will escort children from time to time unsupervised. Exhibit B at 109-110.

54. She further testified that the school aide did in fact escort C.S. to the Social Worker Ms. Graham. Exhibit B at 39.

55. This inability to determine whether an aide is an appropriate resource even by a school's Assistant Principal has been used to find Ms. Denicolo guilty for handling a crying child inappropriately.

56. Where both the Principal and Assistant Principal lack clarity on whether an aide can escort a student, the record provides no rational basis to sustain an offense where a teacher utilizes an aide for assistance. In spite of the Administration's pronouncement that Ms. Denicolo did not comply with a de-escalation ladder, they both agree aides are in fact utilized to escort students.

57. For attempting to talk to the child into entering the room, calling Ms. Graham the social worker, calling Dean Slattery, and ultimately entreating the aide Ms. Rodriguez to further call Ms. Graham, Ms. Denicolo was found "guilty of dealing with a student who was crying and/or in crisis inappropriately," Exhibit A at 26.

### Specification 2

*"On or about between September 1, 2015 and December 14, 2015, Respondent called Student A's parent repeatedly in the evening, after being asked by parent to refrain from calling the home."*

14

**The subject telephone calls vary widely in every witness's testimony yet the Hearing Officer only penalized Ms. Denicolo for a variation in an earlier unsworn statement and illogically ignored evidence from telephone records that corroborated Ms. Denicolo's testimony**

58. Ms. Denicolo was further found to have harassed C.S.'s mother by "calling her repeatedly at home in the evening, even being asked to stop, confronting her publicly in an intimidating fashion, and sending a package to her home which she had reason to know would be unwelcome in light of the ongoing tensions between them.

59. Ms. Denicolo testified she called the parent twice. Exhibit B at 405. In support of her statement, she sought to enter into evidence her phone transcript from Verizon.

60. She obtained the transcript to verify the number of times she called the parent. Exhibit B 407.

61. The transcript identified two telephone calls to the parent between September and December 2015. Exhibit B at 413.

62. The pages were out of sequence at the time of the hearing and certain pages were not noted to be present and counsel for Respondent objected to the exhibit. Exhibit B at 427.

63. The transcript was not entered into evidence but can be found in Exhibit C, Sub-Exhibit D5.

64. In the Hearing Officer's opinion, she indicated disbelieving Ms. Denicolo in that there existed a discord between Ms. Denicolo's testimony that she called the mother of C.S. twice and a rebuttal letter dated December 21, 2015 where she indicated calling the parent 3 or 4 times. Exhibit A at 14. The rebuttal letter is in Exhibit C, Sub-Exhibit D2C.

65. Despite a careful opinion, the Hearing Officer nevertheless overstated the importance of the difference in the rebuttal letter and Petitioner's testimony notwithstanding having been presented with evidence to support the testimony.

66. The Verizon transcript corroborates Petitioner's testimony that she called the mother twice. Petitioner testified that the transcript showed she called twice. Despite this corroboration, the Hearing Officer relied on a rebuttal letter that is an unsworn document and does not have the same effect and sworn testimony.

67. The parent of C.S. did not enter any telephone transcripts to corroborate her testimony nor did Respondent. Alarmingly, Assistant Principal LaFontaine testified that in the course of investigating the events herein, that the mother represented to her that she had records that would evince the number of times Ms. Denicolo called and promised to produce such records yet when she met with Ms. LaFontaine, claimed that "she had gotten a new phone and all her records were gone." Exhibit B at 107. It is arbitrary and illogical to credit the testimony of a person who either lost or destroyed records and to simultaneously ignore records that corroborate Ms. Denicolo's testimony as to the number of telephone calls.

68. The parent of C.S. stated that Ms. Denicolo "called more than four or five times…" Exhibit B at 175. The Assistant Principal testified that she called the parent saying Ms. Denicolo called six or seven times. Exhibit B at 113.

69. The Hearing Officer while attributing Ms. Denicolo's lack of credibility due to a difference in testimony and the rebuttal letter, did not assess a similar discord in the testimony and prior reports of the parent of C.S.

**There is no rational basis from the evidence and testimony presented that Ms. Denicolo was the cause of C.S.'s absence from school**

70. In her testimony, the mother of C.S. stated the child was out for four months "because she felt in fear and I did, too, because of Ms. Denicolo's action, attitude, and behavior, and verbal conversations I had with her." Exhibit B at 203. Inexplicably, the investigation into the incident by the Special Commissioner of Investigation documented that the parent stated that the child was

16

absent for this prolonged period of time "adjusting to new medication…" Exhibit C, Sub-Exhibit D2A at page 2.

71. The mother of C.S. claimed that the child was recommended by a psychologist not to return to school and that a safety transfer was necessary to remove the child from Ms. Denicolo. No psychological evaluation or request for a safety transfer were introduced by the Respondent or the mother to corroborate these claims. Exhibit B at 214-215. Presumably, had such information existed, it would have been submitted in support of Respondent's case.

72. In further contravention of the idea that Ms. Denicolo is the reason C.S. stopped attending school, Assistant Principal LaFontaine testified that other reasons for the child's absence included the health of the child and private family matters. Exhibit B at 112.

73. This discord was not noted in the Hearing Officer's opinion and award. The inconsistency that troubled the Hearing Officer regarding Petitioner's credibility was not even commented on in the parent's credibility and the inconsistency in her testimony is far greater than the one charged to Ms. Denicolo.

**Specification 4**

*"On or about and between September 1, 2015 and December 15, 2013, Respondent stated to Student A's mother words to the effect of:*
*A. Your daughter is a liar.*
*B. Your daughter lied and you backed her up.*
*C. I am pretty upset. I want to know what you said to back your daughter up. I want to know what you said to the office.*
*D. We are not done.*
*E. I am not done with you.*
*F. Can you meet with me? The school is failing your daughter. They do not have your best interest at heart and they are f---ing your daughter up."*

**The Hearing Officer credited the mother's testimony that Ms. Denicolo was aggressive when she spoke to her in the hallway with C.S. present, which supposedly traumatized C.S. yet even after such purported events, the child asked to return to Ms. Denicolo's class which casts grave doubt on the subject matter and manner of the hallway interaction.**

17

74. After C.S.'s unwillingness to enter Ms. Denicolo's classroom on September 30, 2015, Ms. Denicolo saw the mother in the hallway a few days later. Exhibit B at 443.

75. The nature of their communication differs between the mother of C.S. and Ms. Denicolo. The Hearing Officer elected to believe the account of the parent whereby Ms. Denicolo is purported to have tapped her on the shoulder or back and to have said that her adult daughter who brought C.S. to her classroom on September 30, 2015 had lied in her account of the events of that day.

76. Petitioner's account of the nature of the telephone calls and the parent's account differ as to content. Ms. Denicolo stated that the conversations were to ask about C.S.'s wellbeing. The parent's account is that Ms. Denicolo wanted to know what the parent said to administration. The Hearing Officer elected to believe the testimony of the parent.

77. After September 30, 2015, C.S. remained a student of Ms. Denicolo's. In fact, C.S. asked to be returned to Petitioner's class. Exhibit B at 204; Exhibit A at 6, Footnote 3.

78. There is a disconnect between the mother's testimony that the interaction in the hallway with Ms. Denicolo was so distressing that it traumatized the child, and the child's own request to return to Ms. Denicolo's class after being initially placed in a different setting. This disconnect calls into question the tenor of the conversation between Ms. Denicolo and the mother of C.S.

79. Nonetheless, shortly after the above events, the child was absent from school for several weeks.

80. Even if the mother's account is to be believed, a teacher tapping a parent on the shoulder and telling the parent that her daughter had been untruthful in her report to the mother of a day's events is not an appropriate reason to terminate a teacher.

**Specification 6**

*"On or about and between September 1, 2015 and December 14, 2015, Respondent:*
*A. Stated to her classroom that Student A was sick when she was not in fact sick, thereby violating Student A's right to privacy and/or confidentiality.*
*B. Used classroom time to have student make get well letters, which was not part of the school curriculum and/or which violated Student A's privacy.*
*C. Sent said get well letter to Student A's home.*
*D. Caused Student A and/or the parents of Student A to become confused and/or upset after receiving said get well cards.*
*E. Sent an application for home school instruction with the heading of 'as per the administration' to Student A's home without approval of the principal or any other administration of the school."*

**The claim that Ms. Denicolo verbally abused and harassed C.S. by having classmates send get well cards is specious and the motive attributed to Ms. Denicolo for doing so is grounded in speculation without support in the factual record.**

81. On or about October 27, 2015, a package arrived at the home of C.S. from Petitioner. The package contained an application for home school instruction and cards for C.S. from her classmates, the other members of Ms. Denicolo's class. The cards had drawings on them and stated that C.S. was missed by the students and to feel better. See Exhibit C, Sub-Exhibit D3.

82. The mother of C.S. testified that she wanted to receive materials on home school instruction. Exhibit B at 207.

83. Assistant Principal LaFontaine testified that teachers are in fact permitted to send out home school instruction applications. Exhibit B at 97.

84. As to the cards within the package, the mother of C.S. said she showed them to her daughter to see if she could identify the individual authors and that she did recognize some of the names as classmates. Exhibit B at 198-199.

85. The child's mother expressed dissatisfaction with the cards in that "Well I'm not, we're not friends. If someone send you a get well card if you're sick and you have a relationship with

19

them, someone—I have never had anyone send me a whole bunch of get well card when I never told them I was sick." Exhibit B at 198.

86. It was the testimony of Assistant Principal Desiree Lafontaine that the cards were inappropriate because "A. Why should she need to feel better? Q. Well, if she was crying. A. That's inappropriate." Exhibit B at 101.

87. It was the testimony of Principal Unal Karakas that he objected to the cards because "…as an educator of 11 years, I personally never sent home get well cards, or made my students in the class aware of circumstances where a child may have been sick, and acknowledge that to the entire class." Exhibit B at 257. Neither the Principal nor the Assistant Principal could state that sending cards is in anyway a prohibited act. Despite there being no proscription against "get well" cards, Ms. Denicolo's sending these cards has led to a charge of verbal abuse.

88. Petitioner posited that she sent the cards out of humanitarian concern that the other students questioned why after the last time seeing C.S. on September 30, 2015 crying, that she was not coming to class anymore and that in response Petitioner permitted them to write get well cards. The children readily observed the absence of C.S. and questioned such absence. Petitioner further testified that her words to the students who initiated asking if C.S. was all right, was to tell them "would you guys, you know, like to make cards? I think she would like that." Exhibit B at 434-435.

89. The Hearing Officer stated that "[Ms. Denicolo] insists that the whole episode was initiated by children asking where C.S. was and why she hadn't been in class. There is no other direct evidence to either support or contradict that assertion. No students testified at trial, but transcripts of AP LaFontaine's interviews of four students who sent cards appear in the record at D2B. Together they support the notion that Respondent both told them that C.S. was sick, and suggested

20

that they send get well cards, but they do not illuminate how the conversation was initiated." Exhibit A at 23. Notwithstanding this lack of clarity, and in acknowledging that there was no HIPAA violation or violation of law, the Hearing Officer found that Ms. Denicolo disseminated "misinformation" and violated the student's right to privacy and confidentiality "on some level". Exhibit A at 25. Specification 6(b) was sustained that Ms. Denicolo violated the privacy of C.S.

90. The Hearing Officer stated that "there can be no broad finding that the sending of get well cards is misconduct per se." Exhibit A at 23.

91. Despite recognizing that cards themselves are not items of misconduct, the Hearing Officer proceeded to extrapolate malicious motivations for such cards and such motivations have no support in the record.

92. The Hearing Officer's finding that such act did constitute misconduct is grounded in speculation that Petitioner sent the cards as a ploy to regain access to the mother of C.S. Exhibit B at 24. In such finding the Hearing Officer recognized that such motive requires some speculation. She further declared it to be troubling that C.S. who was witnessed by the other first graders crying, being taken from class, and experiencing emotional difficulties of separation anxiety and ADHD was willfully branded as "sick" by Petitioner. Exhibit A at 24.

93. The Hearing Officer acknowledges it is unclear what was said to the students about the cards and that there is no evidence to counter Ms. Denicolo's testimony that the students themselves questioned where C.S. was. The subject of the cards, contrary to the characterization of the Hearing Officer, does not denote any negative connotations towards C.S.'s mental health, indeed the cards profess that the students miss, C.S., are her friends, and expresses hope that she feels better. The animus extrapolated by the Hearing Officer lacks a sound or rational basis in the record and the finding should be vacated.

21

**POINT I**

**CREDIBILITY DETERMINATIONS WHILE GENERALLY ACCORDED GREAT DEFERENCE, ARE SUBJECT TO REVIEW BY THE SUPREME COURT WHERE AS HERE HEARING OFFICER HAS A BIAS TO A WITNESS AND UNREASONABLY DISCREDITS THEIR ENTIRE TESTIMONY.**

94. Petitioner seeks an award vacating the decision to terminate her as such determination is without sound basis in reason and without regard to the facts; the bias of the Hearing Officer, and a penalty that shocks one's sense of fairness. Matter of Pell v. Board of Educ. Of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 N.Y.2d 222, 231 (1974); CPLR 7511.

95. In an arbitration, a Hearing Officer's credibility determinations "are largely unreviewable because the hearing officer observed the witnesses and was 'able to perceive the inflections, the pauses, the glances and gestures-all the nuances of speech and manner that combine to form an impression of either candor or deception.'" Lackow *supra quoting* Matter of Berenhaus v. Ward, 70 N.Y.2d 436, 443 (1987).

96. Nonetheless, a bias can be apparent where a hearing officer discredits a petitioner's entire testimony "…based, in part upon respondent's mischaracterization of a portion of petitioner's testimony…" Principe at 432.

97. Both Principe and Lackow while recognizing the deference that a hearing officer's credibility determinations are afforded, note that where certain testimony is excluded based on bias, that credibility determinations can be re-examined.

98. In the instant matter, the Hearing Officer discredits most to all of Ms. Denicolo's testimony regarding her motives for sending cards, her conversations with the mother, and the number of times she called the mother's home. The Hearing Officer notes that her assessment of Ms. Denicolo's credibility was based upon a variation in Ms. Denicolo's recollection of the number of

22

telephone calls between a rebuttal letter and her testimony. The Hearing Officer ascribes no such negative reflection to inconsistencies in the mother's testimony, the principal's testimony, or the assistant principal's testimony.

99. The mother's testimony varied in the number of telephone calls between what she informed the Assistant Principal and what she informed the court. Her testimony further varied in the reasons for C.S.'s absence from school. During the investigation she reported C.S. was absent due to adjusting to new medication, and at the hearing she informed the Court that C.S. was absent because of being traumatized by Ms. Denicolo. The principal and assistant principal both vacillated in their testimony of whether an aide is an appropriate resource to escort a child. Notwithstanding all of these witlessness occasional inconsistencies, Ms. Denicolo is the only witness whose entire testimony was discredited because of such inconsistency. This unequal application of credibility evaluation evinces a bias on the part of the Hearing Officer.

POINT II

**THE PENALTY OF TERMINATION IS ARBITRARY, CAPRICIOUS, AND SHOCKING TO ONE'S SENSE OF FAIRNESS**

**A. The Hearing Officer inappropriately incorporated references to Ms. Denicolo having a lawsuit against Respondent for retaliation and such reference evinces a bias against Ms. Denicolo and impermissible, unsupported assumptions about Ms. Denicolo's intentions towards C.S.**

100.     The animus speculated by the Hearing Officer, most troublingly, may be attributed to the Hearing Officer's awareness and acknowledgement that Petitioner herein has a lawsuit against Respondent alleging retaliation for reporting a lack of services being provided to special needs students and that the retaliatory acts include the charges herein. The Hearing Officer found that Petitioner "became fixated on her own agenda." Exhibit A at 28. Any lawsuit that Petitioner may have was an inappropriate subject of the hearing and was improperly considered by the Court in determining Ms. Denicolo's actions and motives.

101.     The Hearing Officer used the existence of the lawsuit to make assumptions on Ms. Denicolo's motives which is evident in the opinion where she found that while the parent's testimony about statements Ms. Denicolo made regarding investigating the school were uncharged statements and denied by Ms. Denicolo that such statements "**are important in understanding [Ms. Denicolo's] motivation**." Exhibit A at 27.

102.     The Hearing Officer further speculated about the mindset of Ms. Denicolo based on the parent's testimony "…regarding a number of statements which, although uncharged, provide some context for those interactions, including the phone calls and the comments in the hallway." Exhibit A at 27.

**B. Even if the court accepts all of the Hearing Officer's findings as having a rational basis, the imposed penalty of termination is arbitrary, capricious, and shocking to one's sense of fairness.**

24

103.     To credit testimony of a person regarding statements that were not even chargeable specifications against Ms. Denicolo and then to penalize Ms. Denicolo for such uncorroborated statements is shocking to one's sense of fairness.

104.     Furthermore on October 27, 2015, C.S. was still a student in Ms. Denicolo's class and Ms. Denicolo still had reason and an obligation to follow up on the student's well-being and a reason to contact the student's parent. The P.S. 195 handbook (Exhibit C, Subsection D4 at page 40) denotes teachers are responsible to report to parents on their children including by written communications and telephone calls. As. C.S. remained Ms. Denicolo's student, failing to follow up on the child who had been absent for three weeks would have been an abdication of responsibility.

105.     There is no set guideline on penalties that can be assessed. Precedent in determining whether penalties have been fair or shocking to the conscience however, provide some guidance. Factors that have been involved in determining whether an assessed penalty is appropriate include the teacher's length of tenure, the number of offenses, remorse of the offender, the teacher's amenability to rehabilitation, and seriousness of the offense. For example, in City School Dist. Of the City of N.Y. c. McGraham, 75 A.D.3d 445, 452 (1st Dep't 2010), a teacher who had inappropriate e-mails with a 15 year old student was given a 90 days suspension was not unreasonably lenient in that respondent expressed remorse and was unlikely to repeat actions as well as student moved on with his life. In Principe, the matter remanded for lesser penalty in light of all of the circumstances, where the Dean had a physical confrontation with two students who had disciplinary histories and who were involved in threatening situations. Principe *supra*. A lack of prior disciplinary history during throughout a lengthy teaching career is also considered in determining penalty. In Rubino v. City of New York, 106 A.D.3d 439 (1st Dep't 2013), the teacher

had been terminated at her §3020-a hearing for posting an inappropriate invective of her students on social media then was initially untruthful in denying such actions. Her termination was vacated as being shocking to a sense of fairness.

106.    It is further instructive to look at penalties less than termination that have been upheld as reasonable in other matter. A 6 month suspension and mandatory counseling was found appropriate for a librarian who worked for 20 years, who engaged in inappropriate touching of high school students over the course of 3 years Matter of Asch 104 A.D.3d 415, 521 (1st Dep't 2013); A 5 month unpaid suspension was an appropriate penalty for a high school teacher with over 20 years of service who touched female student's chest and made inappropriate comments which hearing officer found poor judgment but not sexual in nature Matter of Brown v. New York City Bd./Dept. of Educ., 30 Misc.3d 1237(A), 2011 N.Y. Slip. Op. 50380(U) (Sup. Ct. N.Y. Cty. Feb. 10, 2011). Single instances are appropriate for termination such single instance involves corporal punishment, to wit: Matter of Ebner v. Board of Educ. Of E. Williston Union Free School Dist. No. 2, N. Hempstead, 42 N.Y.2d 938 (1977)(appropriately terminated for dragging a student by the hair); Matter of Saunders v. Rockland Bd. of Coop. Educ. Servs., 62 A.D.3d 1012 (2009)(appropriately terminated for allowing student to be strapped to a chair without cause and striking a student in chest); Matter of Giles v. Schuyler-Chemung-Tioga Bd. Of Coop. Educ. Servs., 199 A.D.2d 613 (1993)(appropriately terminated for striking student on the hands with the book and throwing car jack through a window).

107.    Even accepting as true the Hearing Officer's credibility determinations as to the nature of the telephone calls between and the nature of the hallway encounter between Petitioner and the mother of C.S., the assessed penalty of termination for a teacher who has an impeccable

26

26-year record is excessive and shocking to a sense of fairness. Principe v. New York City Dept. of Educ., 94 A.D.3d 431, 433 (1st Dep't 2012).

108.    The Hearing Officer found that Ms. Denicolo cares about her students generally and about C.S. in particular. Exhibit A at 26.

109.    In assessing whether a penalty is appropriate or excessive, all if the circumstances and relevant evidence must be considered as well as whether lesser sanctions are available that would deter petitioner from engaging in any offending conduct again. Principe v. New York City Dept. of Educ., 94 A.D.3d 431, 433 (1st Dep't 2012).

110.    There is nothing in the record to support that Ms. Denicolo had been admonished against contacting the parent in question regarding the child. The child remained Ms. Denicolo's student and a student of P.S. 195 when the cards were sent. There is no evidence that Ms. Denicolo's contact would have been intractable.

111.    The information quoted by the Hearing Officer in assuming Petitioner was on notice of being restrained from communicating with the parent is information that is not properly part of the hearing. Principal Karakas testified regarding a discussion with another student, Student "B". Exhibit B at 261-262. Ms. Denicolo was not charged with any misconduct related to any students other than C.S. The Hearing Officer permitted inflammatory, extraneous, and irrelevant information to sway her opinion of Ms. Denicolo. The Hearing Officer quoted Principal Karakas's testimony in her opinion at page 27-28.

112.    The quoted language is used to indicate "[Ms. Denicolo] had been told before and was on notice that she was not to aggressively insert herself into the business of the [School Based Support Team]." Exhibit A at 27. None of the charges and specifications were with regard to Ms.

27

Denicolo and the School Based Support Team. The charges and specifications were related to interactions with C.S. and her mother.

113.     The Hearing Officer indicated that the impetus for her assessment of termination included "[Ms. Denicolo's] unwillingness to accept even the slightest bit of responsibility, or to acknowledge that even one action on her part might have been ill-considered, now drives my penalty determination in this case." Exhibit A at 29.

114.     This driving force is not grounded in the evidence. Ms. Denicolo in fact admitted responsibility and expressed a wish to have acted differently in two matters. First, she indicated that calling the main office when Ms. Graham and Dean Slattery were unavailable would have been a better course of action than having asked Ms. Rodriguez for assistance. Exhibit B at 433. She then testified that she regretted having told the mother of C.S. in the hallway that she had been written up and that such information she should not have shared with the parent as it was a personal matter. Exhibit B at 450-451.

115.     The Hearing Officer disregarded admissions of Petitioner and then has justified the draconian penalty of termination by finding that Petitioner accepted no responsibility for her conduct.

116.     The testimony and exhibits that are part of the record herein do not support termination of Ms. Denicolo. The Hearing Officer having attributed animus to Ms. Denicolo that "drove" her to decide upon termination, was instead grounded in speculation, uncharged statements, and knowledge that Ms. Denicolo is engaged in legal proceedings for retaliation.

WHEREFORE it is respectfully requested that this Court make an Order vacating the Opinion and Award of the Hearing Officer, reinstating Ms. Denicolo with back pay, and for such other and further relief in Petitioner's favor as this Court may deem just and proper.

Dated: August 25, 2016
   New York, New York

        Respectfully submitted,

        The Jacob D. Fuchsberg Law Firm

        By: Alan L. Fuchsberg
        Attorneys for Anna Denicolo
        500 Fifth Avenue, 45th Floor
        New York, New York 10010
        (212) 869-3500

Of Counsel:  Alan L. Fuchsberg
      Allyson L. Stein

29

## VERIFICATION

STATE OF NEW YORK
COUNTY OF NEW YORK: ss:

ANNA DENICOLO, being duly sworn, deposes and says that: I am the petitioner in this proceeding; I had read the foregoing petition and know the contents thereof; the same are true to my own knowledge, except as to matter therein stated to be alleged on information and belief; and as to those matter I believe them to be true.

Sworn to before me this

25 day of August , 2016.

_____
Notary Public

_____
Petitioner

_____
Printed Name

ALLYSON LINDSAY STEIN
NOTARY PUBLIC-STATE OF NEW YORK
No 02ST6266591
Qualified In Kings County
My Commission Expires 08-06-2020